# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Bankr. Case No. 18-24070-GLT |
| ONEJET, INC., | Chapter 7 |
| Debtor. | |

| | |
|---|---|
| ROSEMARY C. CRAWFORD, Chapter 7 Trustee, | Adv. Pro. No. _____ |
| Plaintiff, | |
| v. | |
| ANTHONY P. CARION, in his individual capacity; | |
| PRIMAIR VENTURE PARTNERS, a California general partnership; | |
| THE ESTATE OF PATRICK JAMES MAGUIRE; | |
| JEAN ANN RIEKE, in her capacity as EXECUTRIX OF THE ESTATE OF PATRICK JAMES MAGUIRE; | |
| JEAN ANN REIKE, in her individual capacity; | |
| THE PATRICK JAMES MAGUIRE AND JEAN ANN RIEKE REVOCABLE TRUST; | |
| JEAN ANN RIEKE, in her capacity as TRUSTEE OF THE PATRICK JAMES MAGUIRE AND JEAN ANN RIEKE REVOCABLE TRUST; and | |
| MAGUIRE/MAGUIRE, INCORPORATED, | |
| Defendants. | |

**COMPLAINT FOR RECHARACTERIZATION OF ALLEGED CLAIM AS EQUITY,
OR, ALTERNATIVELY, TO SUBORDINATE ALLEGED CLAIM AND/OR
OBJECTING TO ALLOWANCE OF ALLEGED CLAIM**

Rosemary C. Crawford (the "Trustee" or "Plaintiff"), in her capacity as Chapter 7 Trustee

for the Estate of OneJet, Inc. (the "Debtor" or "OneJet"), by and through the undersigned counsel,

files this complaint (the "Complaint") against (1) Anthony P. Carion, in his individual capacity;

(2) PrimAir Venture Partners, a California general partnership; (3) the Estate of Patrick James

Maguire; (4) Jean Ann Rieke, in her capacity as Executrix of the Estate of Patrick James Maguire;

(5) Jean Ann Rieke, in her individual capacity; (6) The Patrick James Maguire and Jean Ann Rieke

Revocable Trust; (7) Jean Ann Rieke, in her capacity as Trustee of the Patrick James Maguire and

Jean Ann Rieke Revocable Trust; and (8) Maguire/Maguire, Incorporated (collectively, the

"Defendants").  In support of this Complaint, Plaintiff hereby alleges, upon information and belief,

as follows:

## INTRODUCTION

On January 22, 2019, PrimAir Venture Partners, a California general partnership ("PVP"),

filed a proof of unsecured claim against OneJet in the Case, in the face amount of $10,037,454.00,

which was assigned claim no. 107 (the "Alleged Claim"), allegedly for "Monies Loaned/Line of

Credit."  Defendants Patrick James Maguire, Jean Maguire, and Maguire/Maguire, Incorporated

formed and controlled PVP.

On and effective as of December 18, 2019, PVP purported to sell to Anthony P. Carion

("Carion"), an accountant then rendering services to defendants Patrick Maguire, Jean Reike and

Maguire/Maguire, "all rights and ownership of [PVP]'s outstanding note to OneJet, Inc., along

with any and all stock of OneJet, Inc. held by PVP, for the sum of $1 . . .".  On information and

belief, that "outstanding note" refers to at least part of the Alleged Claim.  To date, however,

Carion, as the alleged transferee, has not filed any notice in the Case under Bankruptcy Rule 3001(e)(2) or otherwise regarding the purported transfer of the Alleged Claim (or any portion of it).

Although (as of the date this Complaint is being filed) the claims docket in the Case reflects that PVP still holds the Alleged Claim, it appears that Carion may or does hold some or all of it. Therefore, both of them are named as defendants in this proceeding. Likewise, because PVP is or was a general partnership, its partners – Patrick James Maguire (until his death), Jean Ann Rieke and Maguire/Maguire, Incorporated -- also potentially may assert some right, title or interest in the Alleged Claim. And because Patrick James Maguire died on December 21, 2019, any right, title or interest he had in the Alleged Claim may have passed either to his probate estate or to a family trust. Therefore, PVP's two surviving partners, as well as the probate estate of Patrick James Maguire and that family trust (by and through the probate estate's executrix and the trust's trustee, Jean Ann Rieke), also are named as defendants in this proceeding, to the extent any or all of them have or may assert any right, title or interest in the Alleged Claim that PVP filed.

Regardless of who asserts any right, title or interest in the Alleged Claim that PVP filed, this is an action to recharacterize the Alleged Claim as infusions of "equity" or as capital contributions pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"). Alternatively, this is an action to equitably subordinate the Alleged Claim to all allowed general unsecured claims in the Case pursuant to section 510(c) of the Bankruptcy Code and/or to strike and disallow the Alleged Claim under section 502(b)(1) of the Bankruptcy Code. At all times pertinent to this Complaint, OneJet's CEO, Matthew Maguire, and his parents, Patrick James Maguire and Jean Ann Rieke (collectively, the "Maguires" or "Maguire Family"), were directors, officers and controlling shareholders of OneJet.

From at least May 2015 onward – before the Alleged Claim arose – OneJet was insolvent or in the vicinity of insolvency.  Even when the Maguires clearly recognized that OneJet was not a viable business, they purported to utilize PVP to prolong OneJet's life through various infusions of capital comprising the Alleged Claim.  But PVP had no income and, therefore, no cash of its own to infuse in OneJet.  Instead, Maguire/Maguire, Incorporated (a company that Patrick James Maguire and Jean Ann Rieke owned), was the "real" source of those cash infusions.  From time to time, as and when OneJet needed money, Maguire/Maguire deposited cash into a bank account that OneJet owned and that was known as the "PVP Note Account," in an effort to sustain and prolong OneJet's failing business.

PVP asserted its "Alleged Claim" – for money it allegedly "loaned" to OneJet or made available to OneJet under a supposed "line of credit" – in a proof of *claim*.  Instead, the Alleged Claim should have been asserted in a proof of *interest*.  Taken as a whole, the facts and circumstances detailed below lead to but one conclusion:  The Alleged Claim comprises various "infusions of equity" or "capital contributions" by Maguire/Maguire in OneJet – not loans.  The Alleged Claim therefore can and should be recharacterized as what it truly is – an equity ownership interest in OneJet, not a claim against OneJet.

Alternatively, the Alleged Claim can and should be equitably subordinated to all allowed general unsecured claims without priority.  The Maguires and Maguire/Maguire, Incorporated controlled PVP.  The Maguires also controlled OneJet and Maguire/Maguire, Incorporated.  The Maguires controlled when, and how much, cash Maguire/Maguire, Incorporated would infuse in OneJet. The cash infusions from Maguire/Maguire, Incorporated to OneJet's "PVP Note Account" provided OneJet with just enough capital to continue operations and secure additional outside investment funds, millions of dollars of which were promptly transferred to Maguire/Maguire,

Incorporated at the expense of OneJet and its creditors.  Millions more were used to enrich the Maguires in other ways, including through the payment of exorbitant and arbitrary sums from OneJet to Matthew Maguire at his whim.  The Maguires further wasted tens of millions of dollars in an expensive and obviously doomed expansion of OneJet's operations, cultivating the illusion of a successful business by touting deals to purchase additional aircraft and other businesses.  Yet, the Maguires continue to be enriched by OneJet's assets to this day.  Before its collapse, OneJet spent millions to purchase and maintain a jet – a jet that the Maguires registered to a separate company owned by Patrick Maguire, and have used to generate substantial revenues for themselves since OneJet ceased operations.  Because Maguire/Maguire deposited funds into OneJet's "PVP Note Account," to keep OneJet afloat and to create the misimpression that PVP (which Maguire/Maguire controlled) provided those funds, even though PVP did not, PVP was an active participant in the Maguires' scheme.  And as the alleged transferee of PVP's Alleged Claim, Carion – and any of the other Defendants who assert any right, title or interest in the Alleged Claim – hold their right, title or interest in the Alleged Claim (or a portion of it) subject to the same limitations, infirmities and accountability as did (or does) PVP.

As a result of the inequitable conduct detailed in this Complaint, which PVP – under the Maguires' dominion and control – furthered and enabled, OneJet was compelled to abruptly cease operations in August 2018 with virtually no assets, leaving legitimate creditors without any source of payment.  Permitting PVP (or its purported transferee, Carion, or any of the other Defendants) to participate in any distribution from the Case on account of the Alleged Claim would confer an unfair advantage upon PVP (and Carion and the other Defendants) and harm general unsecured creditors.  Equitable subordination therefore is consistent with the Bankruptcy Code, and is a proper remedy under the circumstances.

Finally, the Alleged Claim can and should be disallowed under section 502(b)(1). First, PVP (and Carion and the other Defendants, to the extent they assert any right, title or interest in the Alleged Claim) have failed to adequately support it. They have not demonstrated that OneJet, in fact, received funds <u>from PVP</u> totaling the amount of the Alleged Claim or that, if it did, OneJet did not repay some or all of the Alleged Claim. Second, PVP did not provide any such funds to OneJet. PVP therefore is not one of OneJet's creditors. PVP thus lacked standing to file the Proof of Claim with respect to the Alleged Claim. That Proof of Claim should be stricken, and the entire Alleged Claim should be disallowed – because PVP had no legal basis upon which to assert it.

<u>**JURISDICTION AND VENUE**</u>

1.       This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and 1334(b) because it arises under title 11, or arises in or is related to the instant chapter 7 case, *In re OneJet, Inc.*, pending in United States Bankruptcy Court for the Western District of Pennsylvania (the "<u>Court</u>") at Case Number 18-24070-GLT (the "<u>Case</u>"); 28 U.S.C. § 1331 because this litigation arises under the laws of the United States; 28 U.S.C. § 1367(a) and pursuant to principles of supplemental, pendent and ancillary jurisdiction.

2.       This Court has personal jurisdiction over each of the Defendants pursuant to Federal Rule of Bankruptcy Procedure 7004(f) and other applicable law.

3.       Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408, 1409, 1391(a)(2), 1391(a)(3) and 1391(b)(2)-(3). This adversary proceeding is a "core" proceeding to be heard and determined by this Court pursuant to 11 U.S.C. § 157(b)(2).

4.       The Trustee consents to the jurisdiction of the bankruptcy court and the entry of final orders or judgment by the bankruptcy judge.

## THE PARTIES

### A.    The Plaintiff

5.      On October 17, 2018 (the "Petition Date"), certain creditors initiated this Case by filing an involuntary petition for relief under Chapter 7 of title 11 of the Bankruptcy Code against the Debtor.

6.      On November 13, 2018, the Court entered an order for relief [Doc. No. 28] against the Debtor.

7.      On November 13, 2018, the Trustee was appointed to administer the estate of the Debtor.  The Trustee is the duly appointed, qualified and acting trustee in the Case and has the authority and standing to commence this adversary proceeding and to prosecute all causes of action asserted herein.

8.      On or about February 27, 2019, the Court entered an Order authorizing the Employment of Bernstein-Burkley, P.C., as Special Counsel to the Trustee [Doc 451].

### B.    The Defendants

#### Anthony P. Carion

9.      Anthony P. Carion ("Carion") is an adult individual with an address of 27 Driftwood Circle, Pacifica, California 94044.

10.     At all times pertinent to this Complaint, Carion was an accountant who rendered accounting services and related advice to defendants Jean Ann Rieke, Patrick James Maguire (before his death), and Maguire/Maguire, Incorporated.

#### Jean Ann Rieke

11.     Jean Ann Rieke ("Jean Rieke" or "Rieke") is an adult individual with an address of 345 Elm Avenue, Larkspur, California 94939.

12.     Rieke is the mother of Matthew Maguire ("Matt Maguire").

13.     Matt Maguire was a Director and officer of OneJet and an insider of OneJet within the meaning of 11 U.S.C. §101(31) at all times pertinent to this Complaint.

14.     Rieke was the wife of Patrick James Maguire ("Patrick"), until Patrick's death on December 21, 2019.

15.     Rieke was at all times pertinent to this Complaint a Director of OneJet. Rieke was the Secretary of OneJet from the time of its formation through approximately January 2016.

16.     Rieke was an "insider" of OneJet within the meaning of 11 U.S.C. §101(31) at all times pertinent to this Complaint.

17.     Rieke is also the Executrix of the Estate of Patrick James Maguire and the Trustee of the Patrick James Maguire and Jean Ann Rieke Revocable Trust.

18.      On information and belief, Rieke is an owner of defendant PrimAir Venture Partners.

**The Estate of Patrick James Maguire**

19.     The Estate of Patrick James Maguire (the "Maguire Estate") is being administered in the Superior Court of California, County of San Mateo, at Case Number 20-PRO-00418.

20.     The Maguire Estate may be served with process at the address of the Estate's appointed Executrix, Rieke, at 345 Elm Avenue, Larkspur, California 94939.

21.     For the avoidance of doubt, claims set forth in this Complaint against the Maguire Estate are also asserted against Rieke in her capacity as Executrix of the Maguire Estate.

22.     Patrick was at all times pertinent to this Complaint a Director and officer of OneJet prior to his death on December 21, 2019. Patrick served and/or held himself out as the Treasurer

and CFO of OneJet beginning in April 2015, and as Secretary of OneJet as of at least January 2016 until his death.

23.     Patrick was an insider of OneJet within the meaning of 11 U.S.C. §101(31) at all times pertinent to this Complaint.

24.     On information and belief, until his death Patrick was an owner of defendant PrimAir Venture Partners and, upon his death, Patrick's ownership interest in PrimAir Venture Partners are believed to have passed to the Maguire Estate or to the Trust.

25.     On information and belief, following Patrick's death the Maguire Estate is or may be an owner of defendant PrimAir Venture Partners.

**The Patrick James Maguire and Jean Ann Rieke Revocable Trust**

26.     The Patrick James Maguire and Jean Ann Rieke Revocable Trust (the "Trust") was established by a Revocable Trust Agreement dated May 27, 1993 (the "Trust Agreement").

27.     If and to the extent that the Trust or its property has been divided or distributed into other trusts, for purposes of this Complaint such trusts are named herein as Trust Does 1-3 and subsumed within any reference to the Trust.

28.     The Trust may be served with process at the address of its Trustee, Rieke, at 345 Elm Avenue, Larkspur, California 94939.

29.     For the avoidance of doubt, claims set forth in this Complaint against the Trust are also asserted against Rieke in her capacity as Trustee of the Trust.

30.     The Trust Agreement designated Patrick and Rieke as the Trustors and Trustees of the Trust.

31.     Rieke is both the Trustee and presently the sole beneficiary of the Trust.

32.     On information and belief, the Trust is or may be an owner of defendant PrimAir Venture Partners.

## Maguire/Maguire, Incorporated

33.     Maguire/Maguire, Incorporated ("Maguire/Maguire") is a California corporation with an address of 1100 Larkspur Landing Circle S, Suite 108, Larkspur, California 94939.

34.     Patrick and Rieke were at all times pertinent to this Complaint the sole and equal shareholders of Maguire/Maguire until Patrick's death, whereupon his shares in Maguire/Maguire are believed to have passed to the Maguire Estate or the Trust.

35.     Patrick (until his death) and Rieke controlled Maguire/Maguire's actions.

36.     Rieke is the registered agent of Maguire/Maguire and became its sole officer and director following Patrick's death.

37.      On information and belief, Maguire/Maguire is an owner of defendant PrimAir Venture Partners.

## PrimAir Venture Partners

38.     PrimAir Venture Partners ("PVP") is or was a general partnership that Patrick, Rieke and Maguire/Maguire (collectively, the "PVP Partners") formed pursuant to a written agreement dated May 16, 2014, and was registered as a fictitious entity name by Patrick and Rieke in Marin County, California on June 6, 2014, with an address of 1100 Larkspur Landing Circle S, Suite 108, Larkspur, California 94939.

39.     By virtue of their ownership interests in PVP and Maguire/Maguire, Rieke and Patrick controlled PVP's and Maguire/Maguire's actions, which included causing Maguire/Maguire to deliver cash infusions to a bank account that OneJet owned and that was known as the "PVP Note Account."

40.     By virtue of the facts and circumstances, including, but not limited to, Patrick's and Rieke's ownership and control of PVP and of OneJet, PVP is a non-statutory insider of OneJet for purposes of section 101(31) of the Bankruptcy Code.

41.     Each of Defendants, to the extent of any right, title or interest it, he or she asserts in the Alleged Claim, is subject to same limitations, objections, accountability as PVP and is responsible for PVP's acts and omissions recited below.

## FACTUAL BACKGROUND

**A.**     **The Proof of Claim**

42.     On January 22, 2019, PVP filed a proof of unsecured claim against OneJet in the Case, in the face amount of $10,037,454.00, which was assigned claim no. 107 (the "Alleged Claim"), allegedly for "Monies Loaned/Line of Credit."   A copy of PVP's Proof of Claim is attached hereto as **Exhibit A**.

43.     In paragraph 7 of that proof of claim (no. 107), PVP represented that the Alleged Claim does not include interest or other charges.

44.     On and effective as of December 18, 2019, PVP entered into a "Note and Stock Sale Agreement," a true and correct copy of which is attached as **Exhibit B** (the "Transfer Agreement").

45.     In the Transfer Agreement, PVP purported to sell to Carion "all rights and ownership of [PVP]'s outstanding note to OneJet, Inc., along with any and all stock of OneJet, Inc. held by PVP, for the sum of $1 . . .".

46.     On information and belief, the "outstanding note" described in the Transfer Agreement refers to at least a portion of the Alleged Claim.

47.     To date, however, Carion (the alleged transferee under the Transfer Agreement) has not filed any notice in the Case under Bankruptcy Rule 3001(e)(2) or otherwise regarding the purported transfer of the Alleged Claim (or any portion of it) from PVP to Carion.

**B.     OneJet's Formation and Governance**

48.     OneJet is a California corporation originally formed as PrimAir, Inc. on February 13, 2007.  OneJet's name was changed from PrimAir, Inc. to OneJet on or about October 9, 2014.

49.     Matt Maguire, Patrick and Jean Rieke were the founders and initial shareholders of OneJet.  Each member of the Maguire Family sat on OneJet's Board of Directors at all times pertinent to this Complaint, and served as officers of OneJet as described above.

**C.     OneJet's Initial Capitalization and Flight Operations**

50.     Patrick Maguire and Rieke ostensibly provided OneJet startup capital and purchased shares of OneJet stock through PVP.  All monies OneJet purportedly received from, or through, PVP were in fact solely contributed by Maguire/Maguire.

51.     In early 2015, OneJet also secured approximately $1.7 million in funding from outside equity investors.

52.     OneJet used the aforementioned capital to lease two jets and make arrangements for the aircraft to be operated by Pentastar Aviation Charter, Inc. ("Pentastar"), which holds an Air Operator Certificate (which is required to operate commercial flights under the Federal Aviation Administration's regulations).

53.     OneJet's first flight operations commenced in April 2015, beginning with flights between its base city, Indianapolis, and Milwaukee.

54.     OneJet established operating infrastructure at Pittsburgh International Airport and began offering flights from Milwaukee and Indianapolis to Pittsburgh in May 2015.

**D.**      **Characteristics of the Alleged Claim**

55.     Needing more cash, in early 2015 OneJet turned to Patrick, Jean and/or Maguire/Maguire to obtain funds.

56.     On or about January 15, 2015, OneJet executed a "Convertible Promissory Note" in favor of PVP, in the face principal amount of $4,000,000, a true and correct copy of which is attached as **Exhibit C** (the "$4MM Note").

57.     On or about January 20, 2015, OneJet executed a "Convertible Promissory Note" in favor of PVP, in the face principal amount of $750,000, a true and correct copy of which is attached as **Exhibit D** (the "750K Note" and, together with the $4MM Note, the "Notes").

58.     On information and belief, the Alleged Claim comprises amounts that allegedly were provided or made available to OneJet under the Notes, plus other amounts that allegedly were provided or made available to OneJet from time to time thereafter.

59.     Despite PVP's having filed the Alleged Claim in its own name, on information and belief, including because PVP had no income and therefore no money of its own, the amounts allegedly provided or made available to OneJet under the Notes came from Maguire/Maguire – not from PVP.

60.     OneJet did not expend any proceeds of the $750K Note.  Instead, OneJet retained those proceeds in one of its deposit accounts, in an effort to make its balance sheet appear "stronger" to potential third party investors, and otherwise to make OneJet appear to be more creditworthy.

61.     The $750K Note provides that the entire amount matured and became due and payable on July 1, 2015.

62.     Even though the maturity date of the $750K Note came and went, (i) the holder of that Note made no demand upon OneJet to pay that amount upon or after the date it matured, and (ii) OneJet did not pay any of that amount to the holder on or after the date it matured.

63.     On their face, other than reciting a maturity date when the entire amount is due, the Notes lack schedules of the dates upon which any periodic payments are due, including any payments of interest allegedly accruing on the Notes' unpaid "principal" balances.

64.     On information and belief, except for the two Notes, OneJet did not execute any note or other instrument purporting to memorialize any alleged "loans" from PVP, Maguire/Maguire or any other person with respect to the Alleged Claim.

65.     Accordingly, on information and belief, excluding the face amounts of the two Notes, up to $5,287,454 of the Alleged Claim is not evidenced by any promissory note or other instrument of purported indebtedness.

66.     Likewise, because up to $5,287,454 of the Alleged Claim is not evidenced by any promissory note or other instrument, that portion of the Alleged Claim lacks any fixed maturity date and any schedule of the dates upon which any periodic payments are due.

67.     OneJet did not execute any documents in favor of PVP, Maguire/Maguire or any other person granting security interests, liens or other encumbrances in any of its property to secure repayment of the Alleged Claim.

68.     In paragraph 9 of its proof of claim (no. 107), PVP represented that the Alleged Claim is not secured.

69.     Accordingly, the Alleged Claim, if and to the extent it exists, is entirely unsecured.

70.     PVP and Maguire/Maguire knew and expected that repayment of the Alleged Claim depended upon the success of OneJet's business.

71.     OneJet made payments on the Alleged Claim irregularly and in different amounts, as and when OneJet received sufficient funds from investors or funds otherwise became available.

72.     As set forth more fully below, on information and belief, OneJet was inadequately capitalized throughout the period during which Maguire/Maguire contributed funds to OneJet constituting the Alleged Claim.

73.     On their face, both Notes provide expressly that they could be "converted" to (i.e., exchanged for) preferred stock in OneJet, in anticipation of increasing the ownership stake in OneJet.

74.     At the time OneJet signed the Notes or otherwise obtained infusions of cash from Maguire/Maguire (that were deposited in OneJet's "PVP Note Account") that comprise the Alleged Claim, OneJet believed it was unable to obtain funding from outside commercial lending sources, such as banks or other financial institutions.

75.     No sinking fund was established to facilitate repayment of the Alleged Claim.

76.     PVP and Maguire/Maguire considered the cash infusions in OneJet to be an "investment."

77.     Meanwhile, OneJet continued to sell stock in an effort to raise additional money. By early 2016, OneJet had raised approximately $7.9 million through the sale of shares of its Common and Series A stock.

**E.     OneJet's Pivot to Pittsburgh**

78.     In the spring of 2016, OneJet shifted its focus and base of operations from Indianapolis to Pittsburgh, in order to receive $3 million in state and county funding.

79.     On April 21, 2016, OneJet entered into a Credit Agreement with the Redevelopment Authority of Allegheny County, Pennsylvania (the "Redevelopment Authority"),

which provided OneJet with a low interest loan in the amount of $500,000. OneJet subsequently received a second loan from the Redevelopment Authority, in the amount of $1 million, in April 2017.

80.    OneJet also received a $500,000 low interest loan from the Pennsylvania Department of Community and Economic Development, pursuant to a Loan Agreement dated May 12, 2016.

81.    On June 10, 2016, OneJet entered into an Airline Operating Agreement and Terminal Building Lease with the Allegheny County Airport Authority (the "Airport Authority"). OneJet executed an Economic Development Distribution Program Offer Agreement at the same time, and received a $1 million grant from the Airport Authority.

82.    As part of its transition to Pittsburgh, OneJet moved its aircraft from Pentastar to another Air Operator Certificate Holder, Corporate Flight Management ("CFM").

83.    CFM began operating OneJet aircraft out of Pittsburgh on flights that serviced Indianapolis, Milwaukee and Hartford in June 2016.

**F.    OneJet Expands its Fleet and Purchases its First Aircraft**

84.    After increasing its routes and operations in Pittsburgh, OneJet likewise expanded its existing fleet of two aircraft in September 2016 by leasing two more jets.

85.    OneJet also purchased a Hawker Beechcraft 400XP jet bearing tail number N488TM ("N488TM"), which was one of the aircraft it had been leasing from Aircraft Holding Company One, LLC ("Aircraft Holding").

86.    OneJet purchased N488TM from Aircraft Holding pursuant to an August 29, 2016 Aircraft Purchase and Sale Agreement (the "Sale Agreement") that Matt Maguire executed on behalf of OneJet.

87.    The Sale Agreement states a purchase price of $2,175,000.    OneJet paid $813,667.67 in connection with the execution of the Sale Agreement and at the closing on September 29, 2016, and monthly finance payments thereafter.

88.    Having established itself in Pittsburgh, OneJet successfully raised approximately $4 million in 2016 by selling shares of its Series B Preferred stock, primarily to investors in the Pittsburgh area.

**G.    OneJet's Insolvency and Mismanagement**

89.    Despite OneJet's expansion and outward appearance of success through 2016, all was decidedly not well with the company.

**The Maguires' Failure to Implement Appropriate Corporate Policies, Procedures and Controls**

90.    A fundamental problem throughout OneJet's operational life was that it lacked even the minimal policies or procedures necessary to operate the company in an informed, prudent and appropriate manner.

91.    No minutes exist from meetings of OneJet's board of directors except for certain months in 2016 and February 2017.

92.    More importantly, OneJet did not have meaningful accounting, recordkeeping or financial control procedures and systems at any relevant time.

93.    All of OneJet's financial records and data for times prior to early or mid-2016 was irretrievably lost because OneJet failed to pay the IT vendor that hosted that information. Consequently, Erika Davis ("Davis"), a contractor who served as OneJet's primary bookkeeper and accountant beginning in early 2016, had to attempt to reconstruct OneJet's financials to provide a starting point for accounting purposes moving forward.

94.    In a series of November 2017 emails, Matt Maguire questioned Davis about a request made to OneJet's fuel vendors for account statements and asked: "Are we not regularly recording these balances in the accounting system as they come through?"  Davis responded:  "We have not had an accounting system until now.  I'm now paying for monthly Quickbooks online [so] that my team has access."

95.    The problem was exacerbated, and partly caused, by the fact that Matt Maguire persistently concealed and avoided disclosure of OneJet financial information to anyone, including OneJet's own employees and officers, particularly its CFO, Christopher Chaput.

96.    The failure to establish reliable recordkeeping and accounting systems meant that not only OneJet's projected financial performance, but also its historic performance and current financial condition, could not be, and in fact never were, fully known.

97.    The OneJet "financial statements" Matt Maguire relied upon and disseminated to third-parties did not reflect data concerning OneJet's actual operating expenses.  Instead, the financial statements contained mere "estimates" of OneJet's financial performance, derived from the application of general industry averages for metrics such as fuel prices, fuel consumption and maintenance costs per hour flown for the type of aircraft that CFM operated on OneJet's behalf. According to Matt Maguire:

> We had estimates, and, again, we never said that we had audited, reviewed financials or anything else, but we had estimates of financial performance and status of the — of the company.... When I say estimates, it was an attempt to take fairly disorganized information and, you know, apply some general industry metrics, I guess or structure to how typically you would display that.  And, again, I say typically.  I had never run a company before.  I'd certainly never run an airline before.

98.    Thus, Matt Maguire knowingly steered OneJet without information sufficient to fully understand the company's past performance and current position, or to make informed,

realistic plans for its future. Indeed, Matt Maguire, as CEO, did not even have access to any accounting software used by OneJet or its contractors.

99.     The absence of a meaningful accounting system also had more immediate, tangible consequences.

100.     For example, OneJet's bank accounts were consistently overdrawn and credit card balances were not timely paid, thereby obligating the company to pay unnecessary fees, penalties and interest charges.

101.     OneJet's taxes were also not paid in full or on time. Consequently, the Internal Revenue Service filed a $621,556 tax lien against OneJet for excise taxes OneJet had failed to pay beginning in September 2015. Patrick received and forwarded multiple IRS notices of OneJet's tax delinquency to Matt Maguire.

### OneJet's Insolvency

102.     Despite having operated revenue flights since April 2015 and secured substantial funding through equity investments, grants, and low interest government loans, OneJet's operating revenue never came close to covering its expenses. Thus, OneJet was chronically undercapitalized, and both the business revenue it earned and investment capital it raised was rapidly exhausted.

103.     By way of illustration, a profit and loss statement Davis prepared for 2015 shows that OneJet generated approximately $938,000 in revenues with expenses of $8.4 million, netting a loss in excess of $7.4 million for the year. In the same year, OneJet's liabilities exceeded its assets by more than $2.9 million.

104.     Davis prepared a profit and loss statement which shows that in 2016, OneJet had approximately $2.1 million in revenues against costs and expenses of $13 million, yielding a loss

of $10.9 million.  OneJet's liabilities exceeded its assets by more than $3.3 million by the end of 2016.

105.     Indeed, OneJet's financial condition was already so poor in October 2015 that Matt Maguire sent an email to Patrick and Rieke stating: "We're done.  The company will need to shut down operations come Monday . . . . I guess we'll need to retain a bankruptcy lawyer."

106.     And, in March 2016, Matt Maguire informed Patrick and Rieke that Pentastar was going to cease operating OneJet flights unless its outstanding invoices totaling approximately $83,000 were paid.  Patrick advised Matt Maguire to "inform all the investors and the lawyers and vendors Friday that OneJet is declaring bankruptcy immediately."

**H.     The Maguires Artificially Prolong OneJet's Life**

107.     Although OneJet's operating revenue was not nearly enough to cover its expenses, the company nonetheless was able to continue operations through 2018 because the Maguires frequently caused Maguire/Maguire to provide operating capital to OneJet in amounts varying from $2,000 to $202,000, when no commercially reasonable lender would have done so.

108.     The monies provided by Maguire/Maguire allowed OneJet to maintain a false appearance of viability in order to attract additional outside investment funds.

109.     The cash infusions from Maguire/Maguire were not documented and did not have any fixed term or any specified dates upon which payments were due.  Instead, there was a clear agreement and understanding within the Maguire Family that OneJet would transfer monies to Maguire/Maguire as soon as OneJet received sufficient funds from investors or funds otherwise became available.

110.     For example, in an October 2015 email chain among Matt Maguire, Patrick and Rieke, Patrick inquired about the status of funds provided by Maguire/Maguire, to which Matt

Maguire replied "we just need to get the financing deals done and bring in the larger round of capital we have a very good story but need to keep hustling."

111.    In a January 2016 email to his accountant, Patrick stated "We expect to be repaid $2,000,000 in 2016 based on series B funding going on now ...".

112.    Similarly, in February 2016 Patrick sent an email to Matt Maguire inquiring about OneJet's fundraising and return of monies to Maguire/Maguire.  Matt Maguire responded that "The [Series B stock] subscriptions continue to move forward" and "As discussed, this will be 'first money out.'"

### I.    The Maguires Deepen OneJet's Insolvency and Dissipate Remaining Assets

113.    By early 2017, the Maguires knew, and if they had been properly informed could not help but have known, that OneJet's financial condition was such that the company was no longer viable and was not in a position to survive a further expansion of its operations with the attendant increase in expenses.

114.    In a March 2017 email to Matt Maguire, Patrick agreed to transfer additional funds from Maguire/Maguire into OneJet, while observing: "It seems impossible that OneJet could be losing so much money at so fast a rate."

115.    Similarly, in an April 2017 email to Matt Maguire, Patrick stated: "If at this point you are still needing money from me for basic operations, then it's over.  Is that the case?"  Matt Maguire indirectly answered Patrick's question in the affirmative by responding:  "We just invested $1M into aircraft. . . . everyone is doing fine, just cash poor time of year."

116.    Nevertheless, Matt Maguire continued to cause OneJet to pursue an aggressive strategy of growth and fundraising.

## OneJet's Rapid and Unsustainable Expansion

117.    By March 2017, OneJet had added more routes from Pittsburgh servicing Albany, Cincinnati, Hartford, Indianapolis, Louisville, Milwaukee, and Richmond.

118.    As of August 2017, CFM was also operating OneJet flights from Pittsburgh to Nashville and Providence.

119.    In October 2017, OneJet announced the opening of a second base in Milwaukee, and that flights to Columbus and Omaha would begin in November 2017.

120.    In January 2018, OneJet announced the addition of a new route between Buffalo and Albany the next month, which would be accompanied by the introduction of "OneJet Plus" service.

121.    Up to that time, OneJet's fleet had consisted of Hawker 400 light jets capable of carrying up to eight passengers.  In contrast, "OneJet Plus" flights would be operated using much larger Embraer ERJ145 regional jets configured to carry thirty passengers, rather than the airframe's maximum potential load of fifty.

122.    OneJet leased its first ERJ145 jet in January 2018 and a second in February 2018.

123.    In March 2018, OneJet added still more flights, from Pittsburgh to Palm Beach, Kansas City and Memphis, as well as a separate route between Kansas City and Memphis.

124.    In May 2018, OneJet announced that it was working on a deal to acquire Ultimate Jet Charters, LLC ("UJC"), an Ohio-based Air Operator Certificate holder that primarily operated charter and corporate shuttle flights.

125.    At or around that time, UJC began operating certain of OneJet's routes, pursuant to an Aircraft Management Agreement dated April 16, 2018.

**Matt Maguire's Solicitation of Additional Debt and Equity Financing**

126.    In order to satisfy OneJet's urgent need for capital to sustain increased expenditures necessitated by the expansion of its fleet and operations, and to return monies to Maguire/Maguire, Matt Maguire set OneJet on a campaign to raise investment monies with renewed vigor and desperation in early 2017.

127.    To that end, in February 2017 Matt Maguire engaged a securities broker, Boustead Securities, LLC ("Boustead"), to assist in the sale of additional Series B stock in OneJet.  Pursuant to the terms of its engagement with OneJet, Boustead received a commission of ten (10) percent of the proceeds from securities it sold.

128.    Matt Maguire directly, and at times indirectly through Boustead, made materially false and misleading representations concerning OneJet's financial condition and performance to induce prospective investors.

129.    For example, in a December 6, 2016 email to a representative of an investment firm, Matt Maguire represented that each of OneJet's aircraft was "generating approximately $800k in EBITDA...."  That statement was obviously false, as OneJet's direct costs alone greatly exceeded its revenue in 2016.

130.    As another example, Matt Maguire made more widespread and concrete misrepresentations about OneJet's financial performance in a Subscription Agreement that he and Boustead circulated as a "Private Placement Memorandum" to all or virtually all prospective and eventual purchasers of Series B stock beginning in early 2017.  The most significant misrepresentations concerned OneJet's financial performance in 2016, which the Subscription Agreement reported with the following figures rounded to the nearest thousand dollars:

| Revenue | $2,413,000 |
|---|---|
| Direct Costs | $4,196,000 |
| Gross Profit | $(1,783,000) |
| Operating Expenses | $2,108,000 |
| Operating Income | $(3,891,000) |

131.    By way of comparison, according to the aforementioned profit and loss statement that Davis prepared for 2016, the figures that should have been truthfully reported in the Subscription Agreement are as follows:

| Revenue | $2,160,000 |
|---|---|
| Direct Costs | $10,089,000 |
| Gross Profit | $(7,929,000) |
| Operating Expenses | $3,000,000 |
| Operating Income | $(10,929,000) |

Thus, OneJet's actual operating losses were nearly three times what Matt Maguire disclosed to induce investors to purchase OneJet stock.

132.    Around the same time, OneJet, with the assistance of Boustead, began to sell purported debt instruments styled as "Term Note and Charter Agreements" ("Charter Notes").  The Charter Notes were typically issued in increments of $150,000, to be repaid by OneJet with ten percent annual interest after a term of three years.

133.    Investors who purchased Charter Notes ("Note holders") became members of what was referred to as the "Charter Program" or "Naples Club."  The basic premise was that Note holders purchased Charter Notes in exchange for the guaranteed use of OneJet aircraft for certain charter and scheduled flights at discounted prices.

134.    Note holders who provided OneJet five days' notice of a planned charter trip were guaranteed the use of a Hawker 400XP jet, for up to 25 flight hours per year.  The cost to Note

holders for such trips was specified as $900 per hour of actual flight time, with 12 minutes added for taxiing, plus any actual cost for fuel, landing or related expenses incurred during occupied legs. Note holders were not responsible for costs required to arrange occupied flight legs, such as the positioning or overnighting of OneJet's aircraft or crew.

135.    With respect to scheduled flights, Note holders were guaranteed the right to book 20 seats per month for themselves and immediate family on scheduled shuttle flights between Pittsburgh and Naples, Florida at a price of $200 per one-way ticket.

136.    Note holders were also given the option to exchange any of their allotted 20 monthly seats for any seats available on OneJet's scheduled flights to other destinations at a 50% discount from the published fare price.

137.    The "Charter Program" did not and, as devised and implemented, could not have generated any economic benefit to OneJet.

138.    OneJet lost money on each and every "Charter Program" flight.  That outcome was inevitable and obvious from even a cursory analysis of the relevant economics.

139.    For example, as discussed above, Matt Maguire regularly relied upon aviation industry data to estimate operating costs.  Such data indicates that the estimated crew and maintenance-related costs of operating a Hawker 400XP range from approximately $1,500 to $1,800 per hour.

140.    Assuming the lower cost estimate, OneJet was losing $600 for every hour flown under the "Charter Program" by charging Note holders only $900.  And, that is without considering indirect costs for expenses such as hangars, insurance, aircraft finance or lease payments, taxes, depreciation, corporate overhead, or management fees charged by CFM.

141.    Thus, "Charter Program" flights not only failed to generate profits, but directly caused OneJet to sustain losses and rendered the aircraft unavailable for other flight operations, all on top of the ten percent interest OneJet was obligated to pay on the Charter Notes.

142.    To make matters worse, the unavailability of OneJet's own aircraft often forced OneJet to contract with third-party charter services to operate flights for Note holders.  In these instances, OneJet was frequently required to pay the third-party charter service more than twice the amount OneJet could charge the Note holders under the "Charter Program."

143.    For example, an internal OneJet spreadsheet shows that OneJet contracted a third-party to operate a charter flight on January 26, 2018, at a cost of $9,193.00, and invoiced a Note holder only $3,416.40, because that was the estimated amount due under the "Charter Program" had a OneJet aircraft been used for the flight.

144.    In total, the spreadsheet indicates that from just January 16, 2018, through February 6, 2018, OneJet incurred third-party contract costs totaling $233,192.00 on flights for which it invoiced Note holders only $70,425.59.

**J.      OneJet's Default on Key Obligations and Cessation of Operations**

145.    OneJet raised approximately $25 million in additional capital from January 2017 through June 2018, primarily from the sale of Series B stock and Charter Notes to investors in Pittsburgh.  Predictably, however, OneJet quickly burned through the incoming funds without generating anything approaching equivalent revenues.

146.    Indeed, the situation was such that in and October 2017 email chain among the Maguires discussing OneJet's financial condition, Patrick commented to Matt Maguire "It is not clear to me that you as CEO are acting legally."

147.   By mid-2018, OneJet's financial condition had deteriorated to the point that it could no longer be papered over, even by significant influxes of new cash, and OneJet increasingly defaulted on its payment obligations, including obligations to its critical vendors.

148.   For example, in or around late June 2018 AVI Sales & Leasing Services, LLC repossessed one of the ERJ145 jets that it had leased to OneJet earlier that year.

149.   OneJet was also in default with the Airport Authority by failing to pay airline fees and rent due under its terminal lease agreement.

150.   In addition, OneJet was not operating flights out of Pittsburgh to ten other destinations, which was a condition of the $1 million grant it received from the Airport Authority.

151.   On or about July 24, 2018, CFM filed mechanics' liens against six aircraft in OneJet's fleet for debt owed to CFM for aircraft maintenance parts and services, including a lien on N488TM in the amount of $114,664.47.

152.   Pursuant to a Settlement Agreement dated August 14, 2018, all of the mechanic's liens, including the $114,664.47 lien on N488TM, were released in exchange for OneJet's payment of the balance of the CFM debt, which OneJet paid with proceeds derived from the sale of another aircraft that OneJet owned.

153.   Despite OneJet's continuing insolvency and inability to stay current on payments to vendors essential to the company's operations, Matt Maguire continued to solicit investor funds, notably, including $2 million from Vesper Capital pursuant to a Note Payable dated July 10, 2018.

154.   Alarmed by OneJet's evident financial distress, in June 2018 the Airport Authority and a group of investors (collectively, the "Interested Stakeholders") set out to determine OneJet's true financial condition and to salvage it if possible.

155.    At the insistence of the Interested Stakeholders, two consultants, Matthew McDaniel, CPA ("McDaniel") and Seabury Consulting ("Seabury"), were brought in to review OneJet's financials and business plan.

156.    McDaniel was charged with obtaining OneJet's financial records, preparing financial statements and, ultimately, determining OneJet's financial condition and how OneJet had exhausted tens of millions of investment dollars over three years of operations.

157.    In July 2018, McDaniel prepared a year-to-date profit and loss statement, which, due to OneJet's poor recordkeeping, had to be constructed by going through every entry on OneJet's bank account statements and any other records available.

158.    McDaniel also prepared a master spreadsheet, in which he attempted to track the flow of all monies into and out of OneJet from January 31, 2016, onward.

159.    McDaniel commented on the state of OneJet's records in an email to Matt Maguire, explaining that the amount of OneJet's note debt is "not a number we have nailed down at this time" and "Quickbooks is such a mess that the numbers in there don't mean a thing."

160.    Seabury prepared a report that, *inter alia*, provided a critical analysis of OneJet's financial projections and business plan, which Seabury described as lacking "supporting detail"; indicative of "a lack of understanding"; based upon "very aggressive" assumptions; "very optimistic"; and "unsustainable."

161.    With regard to OneJet's recent financial performance, the Seabury report observed that "Year to date through June 2018, OneJet lost $12 million and was losing $2 for every $1 of revenue." In stark contrast, a profit and loss statement Matt Maguire prepared indicated that OneJet only lost approximately $2.1 million during the same six-month period.

162.    By letter dated August 1, 2018, UJC terminated its Aircraft Management Agreement with OneJet on grounds of OneJet's insolvency.

163.    On August 21, 2018, UJC announced that the planned deal for OneJet's acquisition of UJC would not go through.

164.    On August 29, 2018, OneJet announced that it was temporarily suspending all flight operations, ostensibly to pursue its own Air Operator Certificate.

165.    In a September 27, 2018 email to investors, Matt Maguire finally acknowledged that all of OneJet's resources had been exhausted for several weeks, the business could not continue without an infusion of new investment capital, and OneJet was going to be wound up.

**K.    The Maguires Improperly Benefited Themselves at the Expense of OneJet and its Other Investors and Creditors**

**The Maguires' Transfers of Funds From OneJet to Maguire/Maguire**

166.    At various times, and increasingly near the end of OneJet's operational life, Patrick and Matt Maguire caused funds to be transferred from OneJet's bank accounts to bank accounts held by Maguire/Maguire.

167.    At least $3,884,750.54 was transferred from OneJet to Maguire/Maguire in this manner, of which $2,647,122.04 was transferred during the 12 months preceding the Petition Date.

168.    Thus, during the same period in 2018 that OneJet was defaulting on payment obligations to critical vendors and selling an aircraft to remove CFM's mechanic's liens from its other aircraft, Matt Maguire and Patrick were causing OneJet to transfer millions of dollars to Maguire/Maguire.

169.    During this same period, no other investors or lenders of OneJet received the benefit of similar payments.

## COUNT I
### (Recharacterization of the Alleged Claim as Equity or Capital Contributions)

170.    The Trustee hereby incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

171.    In substance and character, the Alleged Claim consists of equity interests (equity infusions) or capital contributions, rather than a claim.

172.    Despite the title of the Notes, the intent of the holders of the Notes and OneJet, as determined from the totality of the circumstances, was to make equity infusions or capital contributions as and when OneJet needed more money.

173.    Under the totality of the circumstances, the Alleged Claim against OneJet (including on account of the Notes) can and should be recharacterized pursuant to section 105(a) of the Bankruptcy Code as equity interests or capital contributions, including, but not limited to, for the following reasons:

(a) Excluding the face amount of the Notes, up to $5,287,454 of the Alleged Claim is not evidenced by any promissory note or other instrument of purported indebtedness;

(b) Excluding the face amount of the Notes, up to $5,287,454 of the Alleged Claim lacks both a fixed maturity date and a schedule of payment due dates;

(c) The Notes lack any schedule of when payments are due, including interest payments allegedly accruing on the unpaid "principal" balance;

(d) The $750K Note provides that the entire amount matured and became due and payable on July 1, 2015, yet (i) the holder of that Note made no demand upon OneJet to pay that amount upon or after the date it matured, and (ii) OneJet did not pay any of that amount to the holder on or after the date it matured;

(e) PVP and Maguire/Maguire knew and expected that repayment of the Alleged Claim depended upon the success of OneJet's business;

(f) OneJet made payments on the Alleged Claim irregularly and in different amounts, as and when OneJet received sufficient funds from investors or funds otherwise became available;

(g) Since its inception, the Alleged Claim was, and is, completely unsecured;

(h) On information and belief, OneJet was inadequately capitalized throughout the period during which Maguire/Maguire contributed funds constituting the Alleged Claim;

(i) The Notes provided expressly that they could be "converted" to (i.e., exchanged for) preferred stock in OneJet, in anticipation of increasing the ownership stake in OneJet;

(j) At the time OneJet signed the Notes or otherwise obtained infusions of cash from Maguire/Maguire that comprise the Alleged Claim, OneJet believed it was unable to obtain funding from outside commercial lending sources, such as banks or other financial institutions;

(k) No sinking fund was established to facilitate repayment of the Alleged Claim; and

(l) PVP and Maguire/Maguire considered their cash infusions in OneJet to be an "investment."

## COUNT II
### (Equitable Subordination Under 11 U.S.C. § 510(c))

174.   The Trustee hereby incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

175.   Under the equities of this case, the Alleged Claim (including on account of the Notes) should be subordinated under section 510(c) of the Bankruptcy Code for purposes of distribution to all allowed general unsecured claims.

176.   At all times pertinent to this Complaint, PVP was entirely under the control of its partners, Patrick, Rieke and Maguire/Maguire, who dominated PVP, and PVP had no independent will of its own.

177.   Maguire/Maguire and PVP (which was under Patrick's, Rieke's and Maguire/Maguire's dominion and control) engaged in inequitable conduct before the Petition Date in the Case, including, but not limited to, (a) enabling OneJet to prolong its existence despite being operated and mismanaged for the personal benefit of the Maguires and Maguire/Maguire, and despite being in or near insolvency, in order to maximize the amount  that the Maguires and/or Maguire/Maguire collected from OneJet, while debts owed to OneJet's other creditors went into default and/or were not paid, and (b) the other misconduct recited above.

178.   Maguire/Maguire and PVP's inequitable conduct harmed general unsecured creditors by diverting millions and millions of dollars from OneJet into the pockets of the Maguires and Maguire/Maguire, enabling the Maguires and Maguire/Maguire to enrich themselves, at the expense of general unsecured creditors who received little or no repayment of their lawful claims.

179.   The Maguires's, Maguire/Maguire's and PVP's inequitable conduct also conferred an unfair advantage on the Patrick, Rieke and Maguire/Maguire (who owned and controlled PVP).

180.    The Alleged Claim substantially dilutes the pool of assets that otherwise would be available for distribution to holders of allowed general unsecured claims, to the detriment of those creditors.

181.    Equitable subordination of the Alleged Claim to all allowed claims of general unsecured creditors is consistent with, and not contrary to, the provisions of the Bankruptcy Code.

**COUNT III**
**(Objection to Alleged Claim 11 U.S.C. § 502)**

182.    The Trustee hereby incorporates by reference the preceding paragraphs of this Complaint as if fully restated herein.

183.    PVP signed and filed the Proof of Claim with respect to the Alleged Claim in its own name, claiming to be owed the Alleged Claim, under penalty of perjury.

184.    PVP and the other Defendants, to the extent they may assert any right, title or interest in the Alleged Claim, did not attach any documents or other material to the proof of claim (no. 107) to demonstrate that OneJet, in fact, received funds from PVP totaling the amount of the Alleged Claim.

185.    PVP and the other Defendants, to the extent they may assert any right, title or interest in the Alleged Claim that PVP filed, have not adequately supported the existence and amount of the Alleged Claim.

186.    On information and belief, OneJet did not receive any funds – let alone funds totaling the amount of the Alleged Claim – from PVP (or, if and to the extent OneJet did receive any such funds from PVP, OneJet repaid some or all of them)

187.    Because PVP did not deliver funds to OneJet comprising the Alleged Claim, and therefore is not owed the Alleged Claim, PVP is not a creditor of OneJet.

188.    Because PVP is not a creditor of OneJet, PVP lacked standing to file the Proof of Claim with respect to the Alleged Claim.

189.    The Proof of Claim that PVP filed with respect to the Alleged Claim can and should be stricken.

190.    The Alleged Claim can and should be disallowed entirely pursuant to section 502(b)(1) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee prays that this Honorable Court enter judgment against the Defendants, jointly and severally, and in favor of the Trustee:

(I)    recharacterizing the [Alleged Claim] against the Debtor in full as equity or capital contributions; or, in the alternative,

(II)    equitably subordinating the [Alleged Claim] against the Debtor to all allowed general unsecured claims; or, in the alternative,

(III)    striking the Proof of Claim that PVP filed and disallowing the Alleged Claim in its entirety;

(IV)    awarding the Trustee all reasonable attorneys' fees, costs and expenses in this proceeding; and

(V)    granting such other and further relief as is just and proper.

Dated: June 7, 2021

Respectfully submitted,
BERNSTEIN-BURKLEY, P.C.

By: */s/ John J. Richardson*

Kirk B. Burkley, Esq., PA I.D.: 89511
John J. Richardson, Esq., PA I.D.: 86045
David A. Jones, Jr., Esq., PA I.D.: 317266
707 Grant Street
Suite 2200, Gulf Tower
Pittsburgh, PA 15219
P: (412) 456-8167/F: (412) 456-8135
Email:  kburkley@bernsteinlaw.com

*Special Counsel to the Trustee*